The 4th District Appellate Court of the State of Illinois has now convened. The Honorable Craig H.D. Armond presiding. Morning, Counsel. I apologize for the delay. Our conference and our previous case went over just by a few minutes. We'll call the next case, which is 4-22-0321, City of Springfield v. Police Protective and Benevolent Association et al. Could Counsel for the Appellant please state your name for the record? Steven Rahn, Assistant Corporation Counsel. Thank you. And Counsel for the Appellate, could you please state your name for the record? David Amerson, Staff Attorney. Thank you, Counsel. Mr. Rahn, you may proceed. Thank you, Your Honor. May it please the Court, it is my privilege and that of my co-counsel Nick Correll to represent the City of Springfield and the Springfield Police Department in this case. Mr. Correll is present in this Zoom meeting, but it is my honor to address the Court this morning. The City of Springfield believes that being forced to employ a police officer who has exhibited brazen racial bias and insensitivity to a fellow officer endangers public safety, the public order, and public policy. Fox was fired as a police officer for using a racist term in a text exchange with a fellow officer who is African American. Maybe we can start right there just because of the term you used there. Insensitivity isn't the question, but you said brazen racial bias. Can you tell me what in the record you rely on to support that assertion? The fact that he sent this text, when the officer receiving the text responded, I don't know what that means. He doubled down essentially and sent a racially, racist definition of the term. And he recognized this by the fact that he had been exchanging messages with the other officer on the departmental message boards. But in order to send this racist text, he said, I'm going to send you a private message on your phone. Right. You use the term brazen racial bias. Can you tell me what about that set of facts supports that characterization? The fact that Mr. Fox does not recognize that as the arbitrator observed, there is a difference between intent and impact. Mr. Fox maintained he was not racist because he didn't intend it in a discriminatory manner. However, to understand and recognize bias, subconscious bias, you need to recognize that there doesn't have to be a blatant discriminatory intent in a comment or in a behavior in order to have a racial impact. And in this case, Mr. Fox has not shown any recognition of the fact that his comments could have a racial overtone, a racial impact, a racial offense, even though he may not intended, may have not had intended it in that manner. I guess that's true at the time, but hasn't he since? Had he, I suppose, if at the hearing he had said, my God, I am embarrassed and sorry that this happened, I've learned from it and I will never, and I will be on the watch from here on out to make sure that my actions do not exhibit unconscious bias and offense. To a neighborhood community, that's not what we have here. What we have here is, hey, I didn't do anything wrong. I didn't, yeah, he was offended and I'm sorry he was offended, but I didn't mean it that way. So, I'm good to go. Fox did not testify that if he were reinstated, he would not engage in this conduct? I believe he did testify that to that effect. However, the fact that he didn't recognize the conduct in the first place, I think, takes issue with the likelihood of him being able to maintain that promise. The police officers have a huge amount of responsibility and they've been sanctioned by the state to use legal force where necessary. They have to apply that force in an unbiased manner. Was there any dispute that the two had engaged in racially toned discussions or conversations or jokes previously? Yes, but that wasn't part of the record because that was just Mr. Fox's hearsay testimony. Officer Williams was not called as a witness. I think it was more than Fox, was it not, who talked about it? I don't recall that being the case, Your Honor. In any event, the timing of this incident was particularly galling as well. The Springfield Police Department had gone through great effort and great length to sensitize its officers to bias and discrimination and harassment. Just two weeks earlier, they had brought in the Department of Human Rights to train their officers. Mr. Ron, that's commendable and I understand where you're going with that. That means the officer should be on notice, but in a strange way, doesn't that suggest a lack of intent, brazen bias? It's almost hard to believe the officer could have forgotten this training and been acting in a deceitful sort of way. That may well be. We have not maintained that he intended his actions to be offensive. He thought it wasn't going to be offensive. He doesn't recognize that what he does can have offense even if it isn't intended that way. And that's the problem here. He doesn't recognize that. He hasn't demonstrated that he recognizes that. To put him back on the street, essentially, the arbitrator recognized that only Fox can answer the question of whether or not he has been reformed. However, by putting him back on the street, the city will become the de facto guarantor of his reformation. Bias in police officers has been well publicized in recent years because the consequences of that is so profound. What would have been his opportunity to demonstrate that? Pardon me? What would have been his opportunity to demonstrate that? He'd been suspended and now he's been terminated. So at what point was he going to be given the opportunity to demonstrate that he understood the seriousness of the circumstance? He's not barred from being hired by other departments. In fact, he was hired by the Grandview Police Department. That's not really addressing the issue for you. He can show he would be able to rehabilitate himself with time. As I said. So you're hiring back? You'll hire him back if he just shows that he understands that this was a bad idea. He's already demonstrated that he didn't understand that this was a bad idea. And how's that? By saying it wasn't racist because I didn't intend it that way. Well, that's part of his defense. Yeah, I mean, you've said that he could do things to rehabilitate himself. And I'm trying to figure out at what juncture in this process was he going to be given the opportunity to do that? If he was suspended and then he was terminated. Well. When was he going to be given the chance to rehabilitate himself? Being a police officer is not a right. It is a privilege. Nobody here claims that. Pardon me? Nobody here asserts that or believes that. That's true. However, what the suggestion that we'll put him back and give him a chance to prove himself. Is basically you've got a situation where a man has shown himself unable to identify that. But you just said it would have been okay if he was hired by somebody else. In other words, he can be racist for someone else, just not for us. Is that what you're saying? Yeah. Basically, Springfield shouldn't have to be the one to guarantee that he has been reformed. If somebody, if some other department wants to give him a chance, fine. Springfield has already seen what he has done. And if he were into a deadly force situation with racial overtones, inevitably someone's going to ask, were there no warning signs here? And the answer would be, of course, there were warning signs. But the system put him back on the street. You know, Springfield... Your basic issue is ratification. You don't want to be stuck with a claim of ratification of his conduct to some later time. So the only remedy is complete termination. I'm not worried about ratification. I'm worried about the harm that would come to a citizen of the city, regardless of whether the city is liable for it. We don't want that to happen. I'm not worried about the ramification that the city might be sued. We don't want an incident in a situation where we have a warning. Well, let's put this back in the legal context in which it reaches us. The arguments that you've made were essentially what you made to the arbitrator. And the arbitrator agreed with you that the conduct was inappropriate. The arbitrator agreed with you that a penalty of suspension without pay, effectively, was appropriate. Did not agree that termination was the only remedy. You have contracted with the union to accept that arbitrator's decision. What you have to convince us about is that public policy would prevent implementation of that arbitrator's decision. Why would it be against public policy? What is the rule you're asking us to create today? It would be against the public policy of eliminating bias in a police department. That is perhaps the preeminent public policy of our time is having our police departments operate without bias. In this case, we have an example where this officer has clearly shown a bias in a racial sense. And by putting him back on the streets, that is undermining the policy of limiting racial bias among police officers. You had another officer in another instance use the same racially charged term.  He used it directed to a member of the public and he used it directed or in the presence of other members of the public. In that instance, you did not feel termination was the only reasonable way to deal with it. In fact, you didn't even suspend him. In that case, the circumstances were he was quoting another member of the public, a term that had been used to him, and he was merely restating that term. It was inappropriate. He was sanctioned for that. And that was used as a learning tool for the department. That statement was not said, meant, or articulated in a racist manner. What does that mean? Tell me what that means. What does it mean to be used in a racist manner? He used it as an invective against somebody. To use it in a sense that causes offense among a large proportion of the community. Whether or not it's intended. Okay. In the case of Officer Fox, and by the way, the other person was Cody Sands who testified that Williams had made racial, racially related jokes about, you know, that certain activity was something for white people. It's a joke. Was it unreasonable for Officer Fox to think that he could make a racially related joke to one of his colleagues who had done the same to him? Yes, Your Honor. And I, with all due respect, I can't believe we have to distinguish the use of the N word. That wasn't my question. My question was whether he could use a racially charged joke. Let's leave out the N word, okay? We can't leave out the N word. That was part of this. You can't whitewash it by saying, well, it was just a joke when he used the N word. Counsel, I want you to listen to me because I do get to ask the questions, okay? And I'm not whitewashing anything. I'm trying to understand, is it just then the use of the word, and then why wasn't it the use of the word in the case of the other officer? It was the use of the word in a context of that this is demeaning. He was my house N word. That is certainly different than the other officer saying. He was talking about himself. He was saying he was that. That's even worse, Your Honor. It's basically saying you're imagining me to be as low as an N word. Okay. How much more insulting can you be? Mr. Ron, so it's my understanding that you're asking the court to apply the public policy exception. You know that, and this is a principle of law. I want you to listen to the question or to my statement and then respond. But there's presumed validity of arbitration awards. We know that these exceptions are very narrow, especially the public policy exception. So, it demands a clear showing that the award contravenes an explicit public policy. So, you understand you're fielding these questions with the court standard being not a real deferential one to the arbitration award. Understood, Your Honor. And as we've said, the city has a policy, the state, the nation has a policy of rooting out bias among its police officers. So, the next step then is that while this type of activity can never be condoned or needed to be disciplined, there was wrongdoing found by the arbitrator. What is your support in this context, in this situation for per se termination? What's your authority? Best authority? By putting him back, we are undermining public policy of keeping officers that have demonstrated racial bias from that. And there's a second one too, and that's effective law enforcement. This court recognized effective law enforcement as a public policy. In this case, there was a great deal of testimony that effective law enforcement depends upon trust and cooperation between the community and the police department. Mr. Fox lost that trust and the department would lose that trust and undermine many of its efforts to effectively engage in law enforcement with the African American community in this city, should he be put back on the street. In sum, we think it's a very clear public policy to eliminate bias among police officers to limit or to improve public policing. And we think that placing Mr. Fox back on the police force will undermine that. We don't want to be responsible for, was there any signs? Could anything have been done? Mr. Rahm, before we run out of time, you compared the precedential other situation where the same term was used in this force. Why in that case was that not per se? I know you compared them, but why in that case was the scenario not right for per se termination based upon those facts? Because in that case, the officer was merely restating what the member of the public had said to him. So he started it. That's the analysis. There's a difference between making a slur and quoting a slur. Yes, you're right. But isn't there a difference too between saying something that's intended to be funny that is ultimately tasteless and not received as funny, as opposed to using that term in anger as an invective against somebody who you don't even know? As I said earlier, the difference is recognizing the difference between intent and impact. He did not recognize that his joking intent, that his supposedly innocent intent, had an offensive impact. And the lack of that recognition indicates a lack of rehabilitation at this point. I believe his words were, I crossed the line. Isn't that what he said? He said that I wasn't being racist. I crossed the line because it offended him. He didn't exhibit any understanding of the fact that he, that Officer Fox can be offensive without intending to be so. I think the difficulty, Mr. I'm sorry. No, go ahead. Thank you. Time is up. Thank you, Justice Jarman, if I may. Go ahead. You have, you're using an argument. Well, I'm going to, I'm going to not ask the questions. I think it's going to prompt more questions. Thank you, Justice. Thank you, Your Honor. Mr. Rahn, you'll have an opportunity on rebuttal. Thank you, Your Honor. Counsel for the appellate may proceed. Good morning, Your Honors. And if it pleases the court, the question from the union's perspective is whether the public policy exception should be expanded in this particular case to prohibit the reinstatement of a police officer who communicated a single racist comment to a co-worker, as you noted, intended as a joke between friends, where the humor was simply miscalculated. Not in the presence of any member of the public or anyone else who also received a 13-month suspension at arbitration as a result. Prior to this, the jurisprudence surrounding vacateur actions, courts vacated awards typically when there's violence in going against the duty of a particular public employee or when there's lying or dishonesty in an official capacity. So this would be an expansion of the public policy exception. Would it be not similar to the cases of child welfare workers, where the value is so high, the public importance is so high, that it might be a one strike and you're out? And in this case, isn't it a valid concern for the city to say, we cannot have this kind of potentially divisive racial commentary from somebody, even the fallout of the one instance? So, Your Honor, I think the case that's best on point is the 1996 AFSCME case from the Supreme Court, where when a vacateur action doesn't have positive law or explicit positive law, although we are alleged that it does, with reference to employment discrimination statutes. But if there's not positive law on the subject, then the public policy has to be drawn from a comprehensive legislative scheme. And the fact that the misconduct goes to the heart of the workers' responsibilities, and I don't think that the city met that burden. Let's think about that, though. It certainly goes to the heart of the police department's responsibilities to administer the law fairly and without racial bias, doesn't it? Oh, yes, Your Honor. I think that the department certainly has a departmental policy on that, but they also contracted for a just cause standard. So when weighing the, I guess, the potential harm to the public, the harm to the department, and the officer's rights under just cause, I think that might be kind of a trite answer. But also, there's a lot, the term bias has come up, and opposing counsel also brought that up during their argument. Bias in the context of policing means an expressed bias towards the public, or at least in the law enforcement function. Here, the arbitrator found no nexus between Fox's comment and his duties as an officer. This might have, I mean, if this took place in a locker room, if this took place in a bar, might it have been different? Typically, officers, which also goes to the city's allegation that this, the fact that Officer Fox switched from the official communication to the private communication shows some kind of a further culpability. I think generally, officers save their off-color humor for private settings, that they're not going to put it out there where the public can hear, where a supervisor can hear. That's just how policing is. I think any workers, how any workers are, I mean, that's kind of the barracks humor argument. So, if the department learned that an officer who otherwise expressed no racial bias in policing was a member of the KKK, doesn't that implicate a potentially significant public policy for that cop to be on the street? Yes, Your Honor, I believe that that is a, there's a case about membership in the KKK where that was found to violate public policy because looking at the actual doctrine and dogma of that group, looking at their charter, expresses a desire towards violence and hatred towards members of the public. Whereas here, there's nothing of the sort. This wasn't public facing, this is between two friends. There's uncontroverted testimony that these two had engaged in this similar type of behavior, but this particular time went over the line for Officer Williams. Although Officer Williams didn't testify. Nonetheless, it violated departmental policy per se. The union agreed to that, Fox agreed to that. But what the city has to prove is that public policy demands termination, that there's no room for remediation, there's no room for retraining, that just the utterance of a word. Forget the context, the arbitrator no longer, if this word is uttered, arbitration becomes essentially pro forma, and that word was uttered, who cares about context, who cares about how it was said, what was intended. Any mitigating factors such as did the officer immediately apologize afterward, what was the officer's record, what was the relationship between these two people, all of that is moot. But doesn't the city's conduct indicate that's not how they're approaching it because there was another instance where the word was uttered, and there was discipline, short of even a suspension, but there was some repercussion. So, yes, your honor, I wouldn't argue that the city does have a contradictory viewpoint of this also because, you know, they refer to the training that took place prior to this. I mean, training on implicit bias suggests that officers are remediable, that training can be a cure to these types of problems within a department. For instance, I mean, if there's any public policy or if there's any trend in policy on how to address this kind of, you know, low-level racial discrimination in the workplace, it's towards retraining, it's towards remediation. The Safety Act just prescribed a whole host of new duties and prescriptions to police officers, but nothing about that reconfigured Title VII or IHRA claims. Instead, they demanded implicit bias training, and same with the department. They provide implicit bias training. This implies that they do believe that officers have implicit bias and that it is remediable, right? And in this instance, it is remediable, found by the arbitrator, impliedly remediable by the department's own policies, but nonetheless, it was a policy violation within the department. The union agreed to that. That means, you know, we're not alleging that this didn't occur. Fox isn't alleging it didn't occur. He's apologetic contemporaneous to the event and at arbitration and remains apologetic about it. So I think that that's the distinction is, is this impossible to remediate? And the arbitrator stated that, no, Officer Fox is remediable under these circumstances. Any idea why this type of scenario was not in the original agreement between the collective bargaining agreement between the parties? So, Your Honor, yes, both parties in their agreement contracted for a just cause standard. Now, that isn't just not every contract between a public employer and a public union includes just cause standards or progressive discipline standards. The city is free to bargain for a higher standard or they can even implement or rather propose departmental policies that are stricter. Like right now, their policy says up to and including discharge, suggesting that there are gradients. They could change their policy and say any such instance we're terminating you. But of course, the union would have a duty to bargain. They could impose it require bargaining over how this is going to play out. So there is a process for doing that. If the city wanted to pursue making it, you know, the utterance of this word is now no matter the context is now terminable. That's something that they could bargain for, but they have not yet. So I also want to point out that many of the things that opposing counsel argues in brief and an argument, this is the first time that they're being brought up. They weren't brought up in the lower court, weren't brought up in arbitration. These concepts of safety, combating the use of harassing communications, inciting communications, you know, like incitement. Basically means by the very utterance a clear and present danger, or it immediately compels people to action. I don't think that that was alleged anywhere else until this forum. And even the argument that public trust has been eroded. Other courts that have examined this issue, for instance, the second district and city of Highland Park where an officer committed a misdemeanor trespass to a vehicle. Was found that despite a crime being committed, this officer did not break the public trust or at least there was no nexus sufficient between that conduct. And the officers duties to implicate the public trust. So again, it's a very high standard for making an arbitral award. Previously, it's for people that are per se irredeemable, for instance, lying and official capacity, which triggers Brady and Giglio issues for police officers or violence against their charges. So that's typically about the level for vacating an award here as the arbitrator found as the union argues and is apparent from the face of the award and of the testimony just didn't meet that standard that this officer was found to be remediable. And while there know what the union is not condoning the actions, neither is the arbitrator, the circuit court. In fact, our witnesses say that this is not to be condoned. That 13 months suspension not only accomplishes the goals of just cause and progressive discipline. It certainly puts other officers on notice and. From the city's perspective, being worried potentially about what someone else may say, didn't you have a warning about this particular person. Well, sure, the city attempted corrective measures, which is the standard when you're in harassment is at issue, they attempted corrective measures, and they brought it all the way to this court. No one can say that the city didn't attempt to remediate the situation as harshly as possible, but the city also contracted for just cause standard. They participate in the arbitral award they selected the arbitrator in conjunction with the union, and the union, just, I think this is just an instance where not liking the result. The city is coming to this court in order to turn it into a quarter review for an issue that is was and is properly before an arbitrator. So if there's no further questions I'll sit. All right, I see none. Thank you, Council, Mr Ron rebuttal. You're on mute, sir. My apologies. Thank you, Your Honor. Very briefly, I do take issue with the council suggestion that the arbitrator found that Mr Fox was remediable. She expressly said that officer Fox is the only one who can answer that question, and that he has the responsibility to demonstrate that there was no finding that he was remediable and with good sense nobody would nobody would make a finding that he was. He's not going to ever do that again. He has to prove that. Secondly, I would. The issue here isn't whether public policy in this case requires termination. The question is whether putting an officer who has demonstrated this behavior back on the force violates public policy, how are those not the same thing. Because the public policy doesn't come into what an appropriate punishment is public policy comes into who is on your police force and who do you know that on the police force. When an officer is hired they typically no one knows whether they have a subconscious bias in this case, we do know that there was a example of bias here. And we've been notified of that. And the city's policy and I think public policy in general, is that they should not be part of the police department. If the decision, if our decision is what you want you know how when you look at a case you say the rule, we get from the Decatur case is X, Y, and Z. What will other people take as the rule from our case if we rule in your favor. That if we ruin this in in the city's favor. Yes, I think the ruling will be that cities do have a responsibility to weed out bias in their department, and there will won't be a situation in this case that. Well, they tried to do it, but they were forced to put it, put him back on by the arbitrator. When you say bias, you're relying on the fact that he made a statement on one occasion, and the conversation that we're, we're all very familiar with. There's nothing in the record that says he was felt to have shown bias in any of his police conduct outside of the statement was that fair. I would disagree with that, Your Honor, I think he showed bias in his testimony at the hearing by not recognizing that there is more than intent that goes to his responsibility to fairly address all members of the public, without racial bias. He exhibited the fallacy that if I only, if I don't intend to discriminate, I'm not, nothing I can do can be racist. And that's simply a incorrect and is a problem among police officers, the subconscious bias of treating persons of African American descent in a different manner for a police stop for a. And that's where the record entry. That's where the record is completely devoid of that ever having happened. That has not happened in this case. So far, you're, you're, you're correct, Your Honor. That that's my address in rebuttal. If court has no further question I would rest. All right. Thank you, counsel, take this matter under advisement, we stand in recess.